MILAN EXPRESS, INC., Plaintiff-Appellee,

v.

AVERITT EXPRESS, INC., United States Fidelity And Guaranty Company, Defendants-Appellants.

No. 00-13481.

United States Court of Appeals,

Eleventh Circuit.

June 19, 2001.

Appeal from the United States District Court for the Northern District of Alabama.(No. 95-02721-CV-AR-S), William M. Acker, Jr., Judge.

Before BIRCH and HULL, Circuit Judges, and TIDWELL[*], District Judge.

HULL, Circuit Judge:

Averitt Express, Inc. ("Averitt") and United States Fidelity and Guaranty Company ("USFG") appeal the district court's denial of their renewed motion for judgment as a matter of law, and the district court's decision to award Milan Express, Inc. ("Milan") the $50,000 amount of the injunction bond and to reinstate a jury verdict for additional damages of $1,870,521.21. After review and oral argument, we affirm in part, and reverse and remand in part.

*I. Factual and Procedural History*

A.  *ICC's Initial Order*

Since the early 1990's, Averitt and Milan, two trucking companies, have been involved in protracted litigation. Their dispute arose from Averitt's attempt to obtain intrastate operating authority in Alabama by contracting with another trucking company, Deaton, Inc. ("Deaton"), to transfer a portion of Deaton's operating authority to Averitt.

In early 1991, Averitt petitioned the Interstate Commerce Commission ("ICC") for approval of the transfer of Deaton's authority to Averitt pursuant to 49 U.S.C. § 11343(e)(1).[1] A number of trucking companies, including Milan, opposed the transfer. The opposing companies argued that the proposed transfer

---

[*]Honorable G. Ernest Tidwell, U.S. District Judge from the Northern District of Georgia, sitting by designation.

[1]At the time the dispute arose between Milan and Averitt, the ICC regulated interstate shipping. Congress deregulated interstate shipping with passage of the Federal Aviation Administration Authorization Act of 1994, which preempted state regulation of the trucking industry effective January 1, 1995. *See* 49 U.S.C. § 14501(c)(1).

was merely a pretense for avoiding the jurisdiction of the Alabama Public Service Commission ("APSC"), which regulated intrastate operating authority within Alabama. On June 25, 1991, the ICC issued a final order approving the transfer of Deaton's authority to Averitt, and holding that, under 49 U.S.C. § 11343, it had exclusive jurisdiction over the transaction which included the power to approve the transfer of intrastate operating authority.[2] A petition for judicial review of the ICC's order was filed in this Court.[3]

B. *Averitt's Separate Lawsuit for an Injunction against APSC*

Meanwhile, based on the ICC's order, Averitt applied to the APSC for a tariff to set the intrastate rate it could charge in Alabama. The APSC refused to honor the ICC's order and rejected Averitt's tariff application. In response, on August 8, 1991, Averitt and Deaton filed a lawsuit against the APSC in the United States District Court for the Middle District of Tennessee.[4] In this lawsuit, Averitt and Deaton asked the district court to declare the ICC's order effective and to enjoin the APSC from interfering with Averitt's intrastate operations in Alabama. Specifically, Averitt and Deaton asked the district court to enter a judgment declaring "[t]hat [Averitt and Deaton] have the right to carry out the transfer of operating authority approved by the ICC without the approval of the APSC," and to enjoin the APSC from interfering with this transfer of

---

[2]49 U.S.C. § 11343(e)(1) gives the ICC the power to:

> exempt a person, class of persons, transaction, or class of transactions from the merger, consolidation, and acquisition of control provisions of this subchapter if the [ICC] finds that—
>
> (A) the application of such provisions is not necessary to carry out the transportation policy of section 10101 of this title; and
>
> (B) either (i) the transaction is of limited scope, or (ii) the application of such provisions is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 11343(e)(1), recodified at 49 U.S.C. § 11323. Once the ICC approves or exempts a transaction, "[a] carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." 49 U.S.C. § 11341(a).

[3]Two trucking companies, namely North Alabama Express, Inc. and AAA Cooper Transportation, Inc., were the named petitioners seeking judicial review from the ICC's order. Milan and the APSC then intervened as petitioners.

[4]Averitt and Deaton's complaint listed the defendants as follows: "Commissioner Jim Sullivan, Commissioner Charles B. Martin, Commissioner Jan Cook, in their official capacity as Commissioner of the Alabama Public Service Commission, constituting the Alabama Public Service Commission; United States of America."

authority. On August 19, 1991, Judge Thomas A. Higgins issued a temporary restraining order and set a bond amount of $10,000. *Averitt Express, Inc. v. Sullivan, et al.,* C.A. No. 2-91-0055 (M.D.Tenn. Aug. 19, 1991). Judge Higgins then transferred the action to the Northern District of Alabama due to the separate appeal of the ICC's order pending before this Court.

Following the transfer of the action, Judge U.W. Clemon of the United States District Court for the Northern District of Alabama issued a preliminary injunction on November 25, 1991. This preliminary injunction was issued against the APSC "and those in active concert or participation with them," including Milan, which had intervened as a defendant in the lawsuit. *Averitt Express, Inc. v. Sullivan, et al.,* C.A. No. 91-c-2294-S (N.D.Ala. Nov. 25, 1991). Specifically, the defendants and intervenors were enjoined from impeding the transfer of operating authority from Deaton to Averitt or interfering with Deaton or Averitt's operation of the authority once transferred. Judge Clemon required Averitt to post a $50,000 bond "for the payment of such costs and damages as may be incurred or suffered by the defendants if this preliminary injunction is subsequently found to have erroneously issued." *Id.* USFG posted the bond as Averitt's surety.

C.      *This Court's North Alabama I*

Subsequently, on September 3, 1992, this Court set aside the portion of the ICC's order approving the transfer of intrastate authority from Deaton to Averitt. *See North Alabama Express, Inc. v. I.C.C.,* 971 F.2d 661 (11th Cir.1992)("*North Alabama I*"), *modified on panel reh'g,* 996 F.2d 1072 (11th Cir.1993).[5] This Court held that "the ICC was correct in applying § 11343 to this transaction," but found that "even if the ICC generally has the statutory authority to approve changes in intrastate certificates, it lacks authority to do so in this case because the proposed transaction is a sham designed solely to divest the [APSC] of its authority in this matter." *Id.* at 665.[6] This Court noted that Deaton and Averitt possessed multiple certificates allowing interstate transport and the proposed transfer would not enlarge Averitt's ability to transport in interstate commerce nor reduce Deaton's ability. *Id.* The interstate authority Deaton was transferring was already

---

[5]The modification only deleted a sentence and worked no substantive change.

[6]This Court also noted "additional evidence of the 'sham' nature of this transaction":

> Deaton and Averitt Express initially filed with the [APSC] and not with the ICC. This is undoubtedly due to the fact that their original contract covered only the sale of the intrastate routes. It was not until they met opposition before the [APSC] that the parties rewrote their agreement, filed with the ICC, and asked the [APSC] for permission to withdraw its [sic] still-pending application.

*North Alabama I,* 971 F.2d at 666 n. 9.

possessed by Averitt, and Deaton had more than one source of authority for the areas covered by the transfer. *Id.*

This Court further explained that "Congress did not give the ICC power to create or transfer intrastate authority absent some connection between the proposed transaction, the intrastate authority, and interstate commerce." *Id.* This Court recognized that "§ 11343 authorizes the ICC to order the transfer of intrastate authority only if the intrastate authority has some relationship with the change in interstate commerce resulting from the proposed transaction." *Id.* However, this Court found that, "[i]n the case at bar, the intrastate authority has a relationship to the interstate routes, but no relationship to the change in interstate commerce simply because there is no change." *Id.* This Court determined that "there being no change in interstate commerce, the ICC is effectively approving nothing more than the transfer of intrastate authority." *Id.* Therefore, this Court concluded, "[b]ecause the supposed interstate aspects of the transaction ... do not constitute a change in interstate commerce, the ICC lacked the power to approve or exempt the intrastate aspects of the transaction." *Id.* at 667. This Court then instructed that "[t]o the extent that it permits the transfer of the intrastate routes, the ICC's ORDER is SET ASIDE." *Id.* (emphasis in original).

D.      *Milan's Motion to Dissolve the Injunction Issued in Averitt and Deaton's First Lawsuit*

After prevailing in this Court in *North Alabama I,* Milan moved to dissolve the injunction issued by Judge Clemon in favor of Averitt and Deaton in their separate lawsuit against the APSC in federal district court. Milan, which was an intervenor in that lawsuit, sought to recover from Averitt and USFG the $50,000 amount of the bond connected with the previously issued injunction, as well as "further damages to be assessed against Averitt Express for the loss of business and profits suffered by Milan Express as a direct result of" Averitt's intrastate operations in Alabama. (R. 92-269, Pl.'s Ex. 28.) On July 15, 1993, the district court dissolved the injunction and dismissed with prejudice Averitt and Deaton's lawsuit against the APSC. (R.92,270, Pl.'s Ex. 29). On September 16, 1993, the district court dismissed without prejudice Milan's claims, as an intervenor, against Averitt and USFG for the bond amount and for excess damages "[b]ased on the parties' pretrial agreement that the Eleventh Circuit decision in [*North Alabama I*] would be dispositive of the issues in this case." *Averitt Express, Inc. v. Sullivan, et al.,* No. 91-C-2294-S (N.D.Ala. Sept. 16, 1993). However, the district court expressly reserved Milan's right to assert its claim for damages against the $50,000 injunction bond in a separate action. *Id.*

E.      *ICC's Second Order*

After *North Alabama I,* Averitt and Deaton petitioned the ICC to reopen the exemption proceedings, seeking to introduce evidence of a connection between the proposed transfer and interstate commerce. On August 16, 1993, the ICC determined that while *North Alabama I* "set aside" the ICC's first order, it nonetheless left the exemption proceedings open. In the ICC's view, *North Alabama I* set aside the ICC's order only to the extent it permitted the transfer of intrastate routes and not as to the ICC's grant of the exemption. The ICC held that the exemption it previously had granted for the proposed transaction was still effective. The ICC reasoned that unless the ICC revoked that exemption, Averitt could operate lawfully under the authority it acquired from Deaton. "This is necessarily so because ... the [11th Circuit's] function does not extend to issuing or revoking authorizations that only this Commission has jurisdiction to issue." Therefore, effective September 1, 1993, the ICC held the exemption proceedings open to allow comment on the issue.

Following the ICC's second order, Averitt recommenced its intrastate operations in Alabama. However, the APSC ordered Averitt to "cease and desist all Alabama intrastate operations" and sent letters to Averitt's customers, advising them that Averitt did not have authority to engage in intrastate commerce in Alabama and threatening them with penalties for knowingly violating the Alabama Motor Carrier Act. The APSC also issued 421 citations to Averitt's drivers.

F.    *Averitt's Second Lawsuit*

On September 29, 1993, Averitt and Deaton filed suit against the APSC in the United States District Court for the Middle District of Alabama, seeking to restrain the APSC from taking any action interfering with Averitt's ICC-approved right to operate in Alabama.[7] On October 1, 1993, Judge Ira DeMent concluded that the district court did not have jurisdiction over orders issued by the ICC and denied without prejudice the request for equitable relief. *See Averitt Express, Inc. v. Sullivan, et al.,* 837 F.Supp. 378 (M.D.Ala.1993).[8]

---

[7]Averitt and Deaton's complaint listed the defendants as follows: "Commissioner Jim Sullivan, Commissioner Charles B. Martin, Commissioner Jan Cook, in their official capacity as Commissioners of the Alabama Public Service Commission; United States of America."

[8]Specifically, the district court determined that in order to decide whether the requested equitable relief was appropriate, it would have to consider the merits of this Court's opinion in *North Alabama I* involving the ICC's order. The court therefore found that it did not have jurisdiction to issue a restraining order in this situation because "[s]ection 2342 grants circuit courts, including the Eleventh Circuit, exclusive jurisdiction over matters originating in the ICC." *Averitt Express, Inc. v. Sullivan,* 837 F.Supp. at 380. Section 2342 grants federal appellate courts exclusive jurisdiction over certain ICC orders, as follows:

    The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or

On October 6, 1993, Averitt and Deaton appealed the district court's order in *Averitt Express, Inc. v. Sullivan* and petitioned this Court for a temporary restraining order ("TRO"). On October 28, 1993, this Court granted the TRO, stating: "The [ICC] issued an order dated August 16, 1993, granting [Averitt] the right to utilize the Alabama intrastate authority it acquired from [Deaton]. That order shall control until such time as this court may invalidate it. The State of Alabama is directed to give full credit to the ICC's ruling until further order of this court." *In re Averitt Express, Inc.,* Appeal No. 93-6835 (11th Cir. Oct. 28, 1993).

G.      *ICC's Third Order*

Ultimately, the ICC considered additional evidence from the parties concerning whether the Averitt-Deaton transfer had effected a change in interstate commerce. On November 26, 1993, the ICC issued its third order, determining that "Averitt will indeed acquire interstate operating authority from Deaton which it does not have, and which permits Averitt to transport new traffic categories in purely interstate commerce." The ICC therefore found that the transfer satisfied the test established by this Court in *North Alabama I* requiring a change in interstate authority. Consequently, the ICC denied Milan's request to revoke the exemption it had granted Averitt.

H.      *This Court's North Alabama II*

Milan appealed to this Court from the ICC's third order, arguing that there was insufficient evidence to show a relationship between the intrastate and interstate transfer as required by *North Alabama I,* and that the transfer was therefore void. On August 25, 1995, this Court first found that the ICC "acted within its authority in reopening the prior proceeding for additional evidence." *North Alabama Express, Inc. v. I.C.C.,* 62 F.3d 361, 364 (11th Cir.1995) ("*North Alabama II*"). This Court further found that the record before the ICC now "supports [the ICC's] decision that the transfer does effect a change in *authority* to transport goods

---

in part), or to determine the validity of—

...

(5) all rules, regulations or final orders of the Interstate Commerce Commission made reviewable by section 2231 of this title and all final orders of such commission made reviewable under section 11901(j)(2) of Title 49, United States Code.

28 U.S.C. § 2342.

in interstate commerce." *Id.* (emphasis added).[9]  However, this Court concluded that this "change in [interstate] authority, however, does not necessarily result in a change in [interstate] *commerce* sufficient to carry a transfer of intrastate routes." *Id.* at 365 (emphasis supplied).  Even though Averitt acquired interstate authority it did not have previously, this Court found that Averitt as transferee has no intention of using that newly acquired interstate authority and thus the transfer "creates no change in 'interstate commerce.' " *Id.*[10] This Court also determined that there was no evidence of any relationship between the interstate and intrastate authority being transferred. *Id.* at 366.  In this regard, this Court explained that, contrary to Milan's assertion, § 11343 "does not require the parties to show the intrastate authority is 'necessary' to the transfer" of interstate authority.  *Id.*  Instead, Averitt must show only "some relationship between the interstate and intrastate authority being transferred." *Id.*  This Court observed that "[a]lthough the level of relationship does not seem to have been developed, it would appear that the ICC's authority must rest on a sufficient connection between the interstate transfer and the attempted intrastate transfer to make the ICC's action reasonable." *Id.*  Finding the record did not show a change in interstate commerce or a relationship between the intrastate and the interstate transfer that affects commerce, this Court "again SET ASIDE the ICC's Order to the extent that it permits the transfer of the intrastate routes." *Id.*

*II. History of the Case <u>Sub Judice</u>*

A.     *Pleadings in District Court*

Following the review of the ICC's third order in *North Alabama II,* Milan filed a separate, new complaint giving rise to this appeal.  Milan's complaint was filed on October 23, 1995 in the United States District Court for the Northern District of Alabama and was assigned to Judge William M. Acker, Jr.[11] Milan's

---

[9]Specifically, this Court found that the transfer effected a change in authority to transport goods in interstate commerce because "Averitt would acquire authority it did not previously have to transport household goods and bulk commodities in interstate commerce," and "Deaton would lose the authority to transport household goods and retain only limited bulk service." *North Alabama II,* 62 F.3d at 364.

[10]As this Court noted, "[T]he objectors argue that because Deaton never transported household goods and commodities in bulk prior to the transfer of its authority and Averitt does not transport these goods under that authority, there in effect has been no change in interstate commerce." *North Alabama II,* 62 F.3d at 365.  This Court found no evidence in the record on appeal to support the ICC's assertions to the contrary.  *Id.*  Therefore, this Court held that "[t]he transfer of interstate authority that has not been used by the transferor to a transferee, who has no intention of using it, creates no change in 'interstate commerce.' " *Id.*

[11]*Milan Express, Inc. v. Averitt Express, Inc. and United States Fidelity & Guaranty Co.,* C.A. No. 95-CV-2721 (N.D.Ala.1995).

three-page complaint alleged that Averitt operated within Alabama pursuant to a transfer of Deaton's intrastate authority, that a district court entered an injunction requiring the recognition of that transfer pursuant to the ICC's order, and that the ICC's order was beyond its authority and unlawful. Milan's complaint alleged that therefore from November 25, 1991 to December 31, 1994, Averitt operated within Alabama without holding legal authority to do so.[12] As a result, Milan's complaint alleged that it had to pay $53,562 in legal fees to set aside the ICC orders and that the revenues Milan would have generated had been diverted to Averitt over a three-year period. Milan sought to recover from Averitt and USFG the $50,000 amount of the injunction bond and additional damages caused by Averitt's wrongful operations under the illegal orders of the ICC, as follows:

> [P]laintiff Milan Express hereby claims the proceeds of that bond set out and attached hereto as exhibit "B" and such additional amount as may be assessed as damages against Averitt Express, Inc. arising out of the wrongful operations of Averitt Express, Inc. in the state of Alabama during the time period which it has so operated *under the illegal authority of the orders of the Interstate Commerce Commission.*

Milan's Complaint at ¶ 5 (emphasis supplied). Milan's complaint alleged that the district court had "authority and jurisdiction" over its claims for the following reasons:

> 6. Plaintiff further asserts that this Court has authority and jurisdiction under the Interstate Commerce Act, 49 U.S.C. § 11708 and to award attorney's fees to the plaintiff incurred in order to establish its rights under this Act. Additionally, this Court has authority and jurisdiction to consider and award these damages as a result of the court's action in granting the injunctive orders which allowed such operations to be begun and continued.

Complaint at ¶ 6.

In this appeal, Milan seeks to sustain its $1,870,521.21 excess damages award as a state law claim over which the district court had discretion to exercise supplemental jurisdiction. Specifically, Milan asserts that Alabama law recognizes an independent claim for bad faith in obtaining an injunction from a court and that Milan's complaint made a claim for excess damages against Averitt for its bad faith in obtaining an injunction from the federal district court. However, Milan made no such claim in its three-page complaint. Nowhere in its complaint did Milan assert a claim for excess damages based on Averitt's bad faith procurement of an injunction from the federal district court. In fact, Milan's complaint does not mention Averitt's actions in obtaining the injunction or use the words "bad faith." Instead, Milan's complaint focuses on lost revenue and damages from Averitt's alleged wrongful operations in Alabama under the illegal orders

---

[12]Milan's three-page complaint is attached as an appendix hereto and contains only a single count.

of the ICC.[13]

The pretrial order, entered on August 7, 1997, described Milan's claims essentially as the complaint had. As in the complaint, Milan's "position" in the pretrial order focused on Milan's claim for its lost profits caused by Averitt's illegal trucking operations in Alabama and its legal costs to have Averitt's operations declared illegal and a sham.[14] The pretrial order does not contain a state law claim for Averitt's alleged bad faith procurement of an injunction from the federal district court. We further note that the pretrial order expanded on the complaint's statement of the district court's jurisdiction, but still based the complaint on federal jurisdiction, as follows:

> Subject matter jurisdiction exists under Rule 65(C) [sic] Federal Rules of Civil Procedure since this action arises out of litigation which was found to be within the jurisdiction of this court under the Interstate Commerce Act. Also, plaintiff contends jurisdiction continues under the Interstate Commerce Act, specifically in 49 U.S.C. § 11708.

---

[13]In its answer to Milan's complaint, Averitt asserted that the district court lacked subject matter jurisdiction to hear Milan's claim under § 11708 of the Interstate Commerce Act and that Milan failed to comply with § 11708(b)'s notice requirements for filing suit under that Act. Regarding Milan's claim on the injunction bond, Averitt also asserted as an affirmative defense that it "acted in good faith and with reasonable justification when obtaining the November 25, 1991 preliminary injunction from the District Court" and that therefore "Milan has no claim on Averitt's injunction bond." Answer at p. 5.

[14]The pretrial order's statement of the case provided as follows:

> (a) *Agreed summary.* This complaint was filed by Milan Express, Inc. to seek *damages for injuries proximately caused by the operations of Averitt Express* while operating under a temporary restraining order and preliminary injunction issued by United States District Judge U.W. Clemon which required the filing of a $50,000.00 bond for operations. The bond was filed by the defendant United States Fidelity & Guaranty Co. as surety to Averitt Express, Inc.

> (b) *Plaintiff's position.* Milan asserts that it has been damaged as a result of its being required to incur legal cost in excess of $50,000.00 in order *to have the operations of Averitt Express determined to be illegal and a "sham."* Further, Milan Express asserts that it lost profits which would have been generated by the transportation of freight which was diverted from it to Averitt Express over a period from November 25, 1991 through December 31, 1994. Plaintiff further asserts that pursuant to the Interstate Commerce Act, 49 U.S.C. § 11708, it is entitled to an award of attorney's fees in this proceeding which seeks to establish its rights under the Interstate Commerce Act.

> (c) *Defendants' position.* Averitt denies any liability to Milan on any basis. Averitt avers that under 49 U.S.C. § 11708, there can be no showing of a "clear violation" of federal law by Averitt, and accordingly, Milan cannot recover. In addition, Milan cannot recover on the injunction bond posted by Averitt because Milan cannot show that the injunction was obtained maliciously, without probable cause, or in bad faith. At all material times, Averitt acted pursuant to valid orders of the Interstate Commerce Commission and/or injunctions issued by Federal Courts. Averitt also disputes Milan's claim that it sustained any damages as a result of actions by Averitt.

Pretrial Order, p. 2, ¶ 5 (emphasis supplied).

Pretrial Order, p. 1, ¶ 2. Section 11708 of the Act allows persons "injured" by a motor carrier to sue if the carrier provided services in clear violation of certain sections of the statute. Rule 65(c) does not provide a cause of action but requires security be given when a temporary restraining order or an injunction is issued.[15] As the district court realized later, neither Section 11708 nor Rule 65(c) provided a basis for any federal jurisdiction over Milan's claims. *See infra* p. 3006.

The case proceeded to a jury trial.

B.      *Opening and Closing Statements*

During trial, Milan described its claim for additional damages as based on Averitt's bad faith *before the ICC.* For instance, in its opening statement, Milan argued as follows:

> Now, we have to prove that Averitt was acting in bad faith—that's the way the law reads—in order to recover anything above the $50,000 bond.... We have two opinions of the Eleventh Circuit saying that the application to the Interstate Commerce Commission was a sham and could not be the basis for a good transfer of Alabama intrastate authority. We believe that establishes bad faith.

[T. at 126.] Similarly, in closing, Milan argued as follows:

> You are going to be asked a question as to whether [Averitt] obtained their authority from the ICC in good faith.... And I think the motive is very clear in this proceeding that Averitt intended to misrepresent to the ICC that they were doing something that was going to change interstate commerce and therefore they should be allowed to have transferred this intrastate authority of Deaton and operate it.

[T. at 622-23.] Throughout the trial, Milan's presentation of evidence of Averitt's bad faith related to Averitt's actions before the ICC.

C.      *Motions for Judgment as a Matter of Law*

At the close of Milan's evidence, Averitt and USFG orally made a joint motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a). The district court took the motion "under advisement." [T. at 444.]

After the close of all of the evidence, Averitt and USFG renewed their joint Rule 50(a) motion for judgment as a matter of law. [T. at 597-98.] Milan also made a Rule 50(a) motion for judgment as a matter of law at this time, contending that this Court's finding that Averitt's actions before the ICC were a "sham"

---

[15]Rule 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c).

was the same as a finding of bad faith for purposes of its claim before the district court. [T. at 597.] Milan clarified that its Rule 50(a) motion was addressed both to its "claim under the theory of bad faith and under [the] bond theory." *Id.* The district court took both motions "under advisement." [T. at 599.]

D.      *Interrogatories & Jury Charge*

The district court then discussed with the parties the interrogatories, which the district court intended to present to the jury in both its jury charge and as part of the verdict form.[16] The first two interrogatories concerned Milan's claim for the face amount of the injunction bond and whether damages were proximately caused by the erroneously issued injunction. These interrogatories stated as follows:

> 1. Did plaintiff, Milan Express, Inc. ("Milan"), prove by a preponderance of the evidence that it suffered damage as a proximate consequence of the injunction which was issued by this court and which was the subject of the $50,000 injunction bond executed by defendant, Averitt Express, Inc. ("Averitt"), as principal, and upon which defendant, United States Fidelity & Guaranty Company ("USF&G"), acted as surety?

> 2. ONLY IF the jury has answered "Yes" to Question No., 1, what, if any, amount of damage not exceeding $50,000 has Milan proven by a preponderance of the evidence that it sustained as a proximate consequence of the erroneously issued said injunction?

The first two interrogatories thus did not ask the jury to decide whether Averitt procured the injunction in bad faith. Instead, because the injunction was already dissolved, the question for the jury (on Milan's claim on the injunction bond) was only whether Milan proved it suffered damages caused by the injunction and if so, the amount of those damages not exceeding the $50,000 face amount of the bond.

The third and fourth interrogatories addressed Milan's separate claim for excess or additional damages. Neither interrogatory mentioned the injunction or Averitt's actions in procuring the injunction from the federal district court. Instead, these interrogatories focused on Averitt's actions before the ICC. The third interrogatory asked the jury to determine whether Averitt obtained its intrastate shipping authority "from the ICC not in good faith," as follows:

> 3. Did Milan prove by a preponderance of the evidence that Averitt operated trucks in Alabama under apparent but contested intrastate motor carrier authority in competition with Milan for some period of time, and that the said apparent intrastate authority, later determined by the Court of Appeals for the Eleventh Circuit to have been erroneously granted by the Interstate Commerce Commission ("ICC"), *was acquired by Averitt from the ICC not in good faith?*

(emphasis added). If the jury found that Averitt had acquired its intrastate authority from the ICC in bad faith, then the jury was to answer the fourth interrogatory, which asked what damages Milan proved it had sustained during the period "between the issuance of the purported intrastate authority by the ICC to Averitt and the

---

[16]The interrogatories and jury verdict are attached as an appendix hereto.

date upon which deregulation of intrastate truckers became effective," as follows:

> 4. ONLY IF the jury has answered Question No. 3 "YES," what, if any, amount of damages has Milan proven by a preponderance of the evidence that it sustained as a proximate consequence of the operation by Averitt under apparent Alabama intrastate authority during the time between the issuance of the purported intrastate authority by the ICC to Averitt and the date upon which deregulation of intrastate truckers became effective?

The fact that Averitt's actions before the ICC, rather than Averitt's actions before the federal district court, were the focus of Milan's claim for excess damages is also evidenced by the nature of the time period referenced in the fourth interrogatory. The time period was from when the ICC issued intrastate authority to Averitt on June 25, 1991 until the deregulation became effective on January 1, 1995. The preliminary injunction, however, was not entered until November 25, 1991, and was dissolved on July 15, 1993. Therefore, the fourth interrogatory instructed the jury to award Milan damages for losses well outside the time period when the preliminary injunction was in place. Specifically, the interrogatory instructed the jury that it could award Milan damages which occurred in the five months before the preliminary injunction was entered and in the eighteen months following its dissolution.[17]

Additionally, Averitt objected to the third interrogatory, arguing that it posed the wrong question. [T. at 649.] The more accurate question for the jury, Averitt contended, was whether "the injunction was obtained in good faith," not whether Averitt obtained its authority from the ICC in bad faith. [T. at 649.] Milan responded that the interrogatory was "correctly stated," since "the origin of either the bad faith or the good faith" " started at the ICC level." [T. at 649-50.][18] The district court stated that it would "leave it like it is" and that Averitt had its exception. [T. at 650.] Thus, once again, Milan made it clear that its claim for excess damages was based on Averitt's alleged bad faith before the ICC.

After the district court charged the jury with the four interrogatories, Averitt objected "with respect to interrogatory (3)" and "into interrogatory (4)." [T. at 672.] Again, the district court noted Averitt's

---

[17]As to the fourth interrogatory, Milan contended after the trial that the time frame for its damages caused by Averitt's actions was enlarged by this Court's grant of a temporary restraining order on October 28, 1993. *See* Milan's Response to Averitt's Post-trial Motion, p. 3, ¶ 7. Another problem for Milan is it has never made a claim against Averitt for bad faith in obtaining the temporary restraining order from this Court.

[18]Averitt stated, "[Q]uestion No. 3, we think, asks just a little bit the wrong question because it asks if the authority was *obtained from the ICC* not in good faith, and we think it should be the injunction was obtained in good faith." [T. at 649 (emphasis supplied).] Milan responded, "Your Honor, I think it's correctly stated because that's the origin of either the bad faith or the good faith is the action behind it. Once it's started at the ICC level, it's either in bad faith or good faith, and it continues on." [T. at 649-50.]

exception.

That Averitt's good or bad faith actions before the ICC were the basis of Milan's separate claim for excess damages was further manifested by the district court's evidentiary rulings and other jury charges at trial. For example, the district court determined that this Court's prior opinions in *North Alabama I* and *North Alabama II,* in which Averitt's petition to the ICC was described as "illegal" and a "sham," were admissible as evidence. The district court said that what the Eleventh Circuit stated in these opinions was "ambiguous" and "need[ed] to be interpreted" by the jury as "fact-finder." [T. at 24.] The district court further allowed the parties to offer their respective interpretations of this Court's opinions in their opening and closing statements to the jury.

In his opening statement to the jury, Milan's counsel argued that this Court's opinions, stating that Averitt's application to the ICC was a sham, evidenced that Averitt's conduct was in bad faith: "We have two opinions from the Eleventh Circuit stating that the application to the Interstate Commerce Commission was a sham and could not be the basis for a good transfer of Alabama intrastate authority. We believe that establishes bad faith." [T. at 126.] When it charged the jury on the third interrogatory, the district court stated that the Eleventh Circuit had determined that the apparent intrastate authority had been "erroneously granted [to Averitt] by the Interstate Commerce Commission" and that "the Court of Appeals used in more than one place the word 'sham.' " [T. at 663-64.] The district court described these determinations by the Eleventh Circuit as "some evidence" of Milan's claim that "the ICC's grant of authority, which turned out to be erroneous, illegal, was obtained by Averitt not in good faith." [T. at 664.]

E.    *Jury Verdict*

After deliberations, the jury returned a verdict for Milan on the first two interrogatories and awarded Milan the full $50,000 amount of the bond.

As to the third and fourth interrogatories, the jury determined that Averitt obtained its "intrastate motor carrier authority ... from the ICC not in good faith" and awarded Milan $1,870,521.21 in excess damages. The district court entered (a) a judgment of $1,920,521.21 against Averitt, representing the $50,000 award on the injunction bond and $1.870,521.21 in additional damages, and (b) a judgment of $50,000 against USFG, representing the amount of the bond.

F.    *Post-Trial Motions*

Thereafter, Averitt and USFG jointly moved again for judgment as a matter of law, pursuant to

Federal Rule of Civil Procedure 50(b), and alternatively moved for a new trial, pursuant to Federal Rule of Civil Procedure 59. Among their contentions, Averitt and USFG repeated the argument that the third and fourth interrogatories were in error because they contemplated a claim based on bad faith before the ICC, rather than bad faith in obtaining an injunction. They argued that the third interrogatory asked the wrong question and that "[b]y asking the jury the interrogatory as phrased, the Court was in effect creating a private right of action for securing an order from the I.C.C. in 'bad faith.' " Defendant's Motion at 11. They also argued that the fourth interrogatory instructed the jury to award damages for injuries incurred by Milan for a period of time after the injunction had been dissolved. *Id.* at 13. Their motion also noted that the fourth interrogatory "again assumes a cause of action for 'bad faith obtaining an order from the ICC,' a cause of action which does not, and cannot under applicable law, exist." *Id.*

In response to Averitt and USFG's post-trial motion, Milan continued to argue, *inter alia,* that the third and fourth interrogatories correctly stated its claim for damages in excess of the injunction bond.

G.    *Dismissal for Lack of Subject Matter Jurisdiction*

The district court never ruled on the post-trial motions. Instead, on October 28, 1998, the district court declared "[a]ll pending post-judgment motions" moot and vacated the final judgment, finding *sua sponte* that it did not have subject matter jurisdiction over the case from the outset. *Milan Express, Inc. v. Averitt Express, Inc., et al.,* C.A. No. 95-AR-2721-S (N.D.Ala. Oct. 28, 1998). The district court determined that the jurisdictional statement contained in the pretrial order had been erroneous, and that neither Federal Rule of Civil Procedure 65(c) nor 49 U.S.C. § 11708 gave it jurisdiction over Milan's claims.[19] The court dismissed Milan's action without prejudice.

Following the district court's dismissal, Milan filed a motion to alter or amend the judgment, pursuant to Federal Rule of Civil Procedure 59(e). In its Rule 59(e) motion, Milan argued for the first time that the court had jurisdiction over its claims pursuant to Rule 65.1[20] and 28 U.S.C. § 1352.[21] Milan also stated that

---

[19]The district court noted that Averitt had done nothing that could even arguably fall under § 11708 and that § 11708 "was never intended as a vehicle for making the kinds of claims here made by Milan against Averitt and USF&G." *Milan Express, Inc. v. Averitt Express, Inc. et al.,* C.A. No. 95-AR-2721-S, at 3-5 (N.D.Ala. Oct. 28, 1998).

[20]Rule 65.1 provides in part:

> Whenever these rules ... require or permit the giving of security by a party, and security is given in the form of a bond or stipulation or other undertaking with one or more sureties, each surety submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as the surety's agent upon whom any papers affecting the surety's liability on the

although it "did additionally claim that federal subject matter jurisdiction was granted by sections of the Interstate Commerce Act, the case was, in fact, tried as a claim for damages against an injunction bond and over and above that bond for the wrongful issuance of an injunction." Finally, Milan argued that "[t]o the extent that the Court may perceive that the claim, as tried, extends beyond simply a suit on a bond under § 1352, the concept of supplemental jurisdiction" was available.

The district court agreed with Milan in part and found that 28 U.S.C. § 1352 provided subject matter jurisdiction over Milan's claim for the $50,000 amount of the injunction bond itself. Thus, on November 20, 1998, the district court reinstated the $50,000 portion of the verdict. In reinstating the judgment to that extent, the district court did not discuss Milan's excess damages claim. Thus, the district court's order of November 20, 1998 left intact its earlier order dismissing Milan's excess damages claim for lack of subject matter jurisdiction. On December 21, 1998, the district court amended its November 20 order to deny Averitt and USFG's post-trial motion for judgment as a matter of law or, alternatively, for a new trial.

H.      *First Appeal*

Milan appealed from the district court's order dismissing its excess damages claim for lack of subject matter jurisdiction. Averitt and USFG cross-appealed the district court's final judgment of $50,000 on Milan's claim on the injunction bond. On April 7, 2000, this Court affirmed the district court's decision to the limited extent that it found subject matter jurisdiction over Milan's claim on the injunction bond. In doing so, however, this Court held that neither Rule 65.1 nor 49 U.S.C. § 11708 provided a basis for the district court's jurisdiction over Milan's claim on the bond. *Milan Express, Inc. v. Averitt Express, Inc.,* 208 F.3d 975, 979 (11th Cir.2000). Instead, this Court agreed with Milan that 28 U.S.C. § 1352 provided jurisdiction over Milan's claim on the bond. *Id.* Section 1352 provides that district courts have original jurisdiction over "any action on a bond executed under any law of the United States." 28 U.S.C. § 1352. Thus, this Court joined "our sister circuits in concluding that an injunction bond, issued pursuant to Rule 65(c) to secure a federal

> bond or undertaking may be served. The surety's liability may be enforced on motion without the necessity of an independent action.

Fed.R.Civ.P. 65.1.

[21]Section 1352 provides in part:

> The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States.

28 U.S.C. § 1352.

court injunction, is in fact a 'bond executed under any law of the United States.' " *Id.* at 980.

Although concluding that federal jurisdiction existed over Milan's claim on the bond, this Court nonetheless reversed the district court's entry of judgment on the jury verdict as to Milan's claim on the bond. *See id.* at 979-80. This Court found that the district court had erred in submitting the claim on the bond to the jury because "whether to award damages pursuant to an injunction bond rests in the sound discretion of the court's equity jurisdiction." *Id.* at 980 (quotation omitted). This Court therefore remanded the case to the district court to consider whether to exercise its discretion to award Milan the amount of the injunction bond. *Id.* This Court further held that the district court's denial of Averitt and USFG's motion for judgment as a matter of law as to Milan's claim for the bond amount was not erroneous, stating: "This Court has already held that the ICC's order, which the injunction was issued to protect, was erroneous. Thus we cannot now say that the injunction was appropriately issued." *Id.* at 981 (citation omitted).

Having found that there was federal jurisdiction over Milan's claim on the bond, this Court remanded the excess damages claim to the district court so that the district court could consider whether to assume supplemental jurisdiction over that claim, pursuant to 28 U.S.C. § 1367. *Id.* Importantly for the issues in this second appeal, this Court also pointed out that the district court had never ruled on Averitt's motion for judgment as a matter of law or, alternatively, for a new trial regarding the excess damages claim. *Id.* Therefore, in the first appeal in this case, this Court concluded that "[b]ecause the district court did not rule on Averitt's motions regarding the excess damages claim, we will not consider those claims herein, but will leave that consideration to the district court on remand." *Id.*

I.      *On Remand to the District Court*

On May 31, 2000, the district court on remand made an independent determination that, with regard to Milan's claim on the injunction bond, Milan was entitled to recover "the full amount of the bond, namely, $50,000." *Milan Express, Inc. v. Averitt Express, Inc., et al.,* C.A. No. 95-AR-2721-S, at p. 2 (N.D.Ala. May 31, 2000). Next the district court addressed what it called "Milan's other claim, namely, its tort claim for damages beyond the amount of the injunction bond." *Id.* at 1.

The district court decided to exercise supplemental jurisdiction over that excess damages claim under 28 U.S.C. § 1367, and decided "not to ignore the jury verdict" as to that claim, which it had earlier set aside. *Id.* at 4. The district court then reinstated the jury's verdict on the excess damages claim, stating: "[T]he court can discern no reason to retry the issue that has already been fully tried to a jury." *Id.* The district court stated

that "[t]here was a substantial evidentiary basis for the jury's answers to special interrogatories numbered 3 and 4, finding (1) that *Averitt acquired its apparent intrastate operating authority 'not in good faith;'* (2) that as a result Milan sustained compensatory damages in the amount of $1,870,521.21; and (3) that its said damages are over and above the amount of the $50,000 covered by the bond." *Id.* at 5 (emphasis supplied).

The district court therefore denied Averitt and USFG's post-trial motion for judgment as a matter of law or, alternatively, for a new trial and reinstated the final judgment (a) against Averitt in the amount of $1,920,521.21 million, representing the $50,000 award on the injunction bond and $1,870,521.21 in damages in excess of the bond, and (b) against USFG for the $50,000 amount of the injunction bond. The appeal presently before this Court is Averitt and USFG's appeal from the district court's order on remand.

### III. Discussion

A.      *Award of $50,000 Bond Amount*

Averitt contends that the district court abused its discretion by awarding Milan the $50,000 injunction bond, arguing that (1) Milan was not wrongfully enjoined, (2) Milan failed to prove its damages were proximately caused by the injunction, and (3) the district court failed to address the equitable factors in determining the amount of the bond to which Milan was entitled. This Court reviews the district court's decision to award Milan the $50,000 amount of the injunction bond for abuse of discretion. *State of Alabama ex rel. Siegelman v. U.S. E.P.A.,* 925 F.2d 385, 389 (11th Cir.1991).

Under Federal Rule of Civil Procedure 65(c), an injunction bond provides security for "such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). To recover against an injunction bond, a party must prove that it was wrongfully enjoined and that its damages were proximately caused by the erroneously issued injunction.

In the first appeal in this case, this Court recognized that the issuance of the injunction in this case was erroneous. *See Milan Express, Inc. v. Averitt Express, Inc.,* 208 F.3d at 981. Specifically, this Court stated:

> This Court has already held that the ICC's order, which the injunction was issued to protect, was erroneous. *North Alabama Express, Inc. v. ICC,* 62 F.3d 361 (11th Cir.1995). Thus we cannot now say that the injunction was appropriately issued.

*Id.* Moreover, "a prevailing defendant is entitled to damages on the injunction bond unless there is a good reason for not requiring the plaintiff to pay in the particular case." *Siegelman,* 925 F.2d at 390 (quoting with approval *Coyne-Delany Co., Inc. v. Capital Dev. Bd. of Illinois,* 717 F.2d 385, 391 (7th Cir.1983)). In this

case, the district court on remand properly considered the equities of the case and determined that Milan sustained damages as a proximate consequence of the wrongfully obtained injunction.

We find that the district court did not abuse its discretion in awarding the full $50,000 bond amount to Milan. Thus, we affirm the district court's denial of Averitt and USFG's joint motion for judgment as a matter of law as to Milan's claim for the bond amount.

B.      *Excess Damages Claim*

Averitt also argues that the district court's order reinstating the jury's verdict on Milan's claim for excess damages must be reversed because the district court erred in denying Averitt's motion for judgment as a matter of law as to this claim. We review the denial of a motion for judgment as a matter of law *de novo*. *Morro v. City of Birmingham,* 117 F.3d 508, 513 (11th Cir.1997).

On appeal, Milan contends that the district court appropriately exercised supplemental jurisdiction over its claim for excess damages, pursuant to 28 U.S.C. § 1367. On appeal Milan describes its claim for excess damages as one for bad faith procurement of an injunction under Alabama state law. The Alabama Supreme Court has recognized a cause of action for bad faith procurement of an injunction. *See Ex parte Water Jet Sys., Inc. v. Brown,* 758 So.2d 505, 513 (Ala.1999). Specifically, the Alabama Supreme Court has held that "[i]f a plaintiff seeks an interlocutory injunction in bad faith, the defendant can recover damages from the plaintiff in excess of the amount of the bond." *Id.* Under Alabama law, a claim for bad faith procurement of an injunction would allow plaintiff to recover damages in excess of a bond if the injunction is (1) wrongfully issued and (2) procured in bad faith.

The problem for Milan is that its complaint, the statement of Milan's claim in the pretrial order, the court's interrogatories to the jury, and the jury's verdict addressed a claim for Averitt's actions in bad faith before the ICC and not any claim for bad faith in procuring the injunction from the federal district court.[22]

This is not a case where the jury rendered a general verdict. Instead, the jury was given special

---

[22]As Averitt's reply brief on appeal states:

> Milan's complaint fails to identify the source of law for its excess damages claim, and it is devoid of allegations to support the necessary elements of such a claim. At trial, Milan insisted that its excess damages claim turned on Averitt's bad faith in petitioning the ICC, *rather than bad faith in procuring the injunction.* This improper focus on Averitt's good or bad faith in petitioning the ICC infected both the jury instructions and the resulting verdict.

Reply Brief at 1 (emphasis in original) (citations omitted).

interrogatories which reveal precisely what claims the jury was asked to decide and what the jury decided. Accordingly, in reaching a verdict on the excess damages claim, the jury determined only that Averitt had obtained its authority "from the ICC not in good faith," and did not make any determination regarding Averitt's actions in obtaining the injunction from the federal district court.[23]

The only claim for excess damages pled in Milan's complaint, included in the pretrial order, instructed in the jury instructions, and decided by the jury is a claim for bad faith before the ICC.[24] No such cause of action exists under Alabama or federal law. A jury verdict on a non-existent cause of action cannot be upheld; nor can a verdict stand on the basis of an existing state law claim which was not pled or decided by the jury.[25]

*IV. Conclusion*

For the reasons stated above, we affirm in part and reverse in part the district court's denial of Averitt

---

[23]On appeal, even Milan unwittingly admits that there is a difference between an allegation of bad faith before the ICC and an allegation of bad faith in procuring an injunction. In the course of arguing that its excess damages claim against Averitt is not preempted by the Interstate Commerce Act, 49 U.S.C. § 11341, Milan acknowledges that bad faith before the ICC and bad faith in obtaining an injunction are separate inquiries, as follows:

> Furthermore, Milan's lawsuit is based upon Averitt's affirmative actions in procuring injunctive relief against Milan in bad faith. Even if Averitt had properly acquired Deaton's intrastate authority, § 11341 would not insulate it from liability for its bad faith in enjoining Milan.

Appellee's Brief at 30.

[24]It seems possible that the genesis of Milan's excess damages claim being pled and tried as a federal claim for bad faith before the ICC may have been Milan's mistaken belief that the claim for excess damages was a federal law claim which arose under the Interstate Commerce Act, 49 U.S.C. § 11708. *See* discussion *supra* pp. 3001 - 02 and 3006 - 07. It was only after the jury's verdict and the district court's entry of final judgment that Milan apparently recognized that it did not have a federal claim for excess damages under § 11708 based on Averitt's actions before the ICC and began to attempt to assert a state law claim under Alabama law.

[25]In addition to the arguments discussed above, Averitt continuously has argued that the district court erred in allowing this Court's prior two published opinions, reviewing the ICC's orders, to be introduced as exhibits to the jury and in charging the jury that it was for the jury to decide the effect of this Court's prior opinions. We agree with Averitt that the district court so erred and this error alone would require a new trial. *See, e.g., Johnson v. Colt Indus.,* 797 F.2d 1530, 1534 (10th Cir.1986); *U.S. v. Hawley,* 768 F.2d 249, 252 n. 3 (8th Cir.1985). However, we need not discuss this issue at length because of our reversal of the judgment in favor of Milan on its excess damages claim on other grounds.

> Averitt also argues that Milan has not proven the elements of a claim for bad faith procurement of an injunction, and that any such state law claim under the facts here is preempted by the Interstate Commerce Act. Having found that no such state law claim was ever pled or charged to the jury, we do not reach these issues.

and USFG's motion for judgment as a matter of law or, alternatively, for a new trial, and affirm in part and reverse and vacate in part the judgment. Specifically, we affirm the district court's judgment in the amount of $50,000 in favor of Milan and against Averitt and USFG on Milan's claim on the injunction bond. We reverse and vacate the district court's judgment of $1,870,521.21 in favor of Milan and against Averitt on Milan's claim for excess damages. We further find that the district court erred in denying Averitt's motion for judgment as a matter of law as to Milan's claim for excess damages and on remand the district court is directed to enter final judgment in favor of Averitt on Milan's claim for excess damages.

AFFIRMED IN PART, REVERSED AND VACATED IN PART.

APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

MILAN EXPRESS, INC., Plaintiff,

v.

AVERITT EXPRESS, INC. and United States Fidelity & Guaranty Co., Defendants.

CIVIL ACTION NO: (formerly 91-C-2294-S).

Oct. 23, 1995.

COMPLAINT

1. Plaintiff Milan Express, Inc. ("Milan") is a Tennessee corporation doing business as a motor common carrier of general commodities holding authority to operate intrastate within the state of Alabama issued by the Alabama Public Service Commission in certificate Nos. 684, 678, 795, and 580. Milan also holds authority as an interstate carrier of general commodities to and from the state of Alabama with authority to serve the balance of the United States.

2. The defendant Averitt Express, Inc. is also a motor common carrier authorized to provide service in interstate commerce to and from the state of Alabama. Averitt Express, Inc., however, did not hold any authority or authorization from the Alabama Public Service Commission to provide service intrastate within the state of Alabama until issued a certificate on January 1, 1995. Averitt Express, however, has been operating as a general commodity carrier within the state of Alabama, purportedly under the authority of Deaton, Inc. at least since November 25, 1991 when in Case No. 91-C-2294-S a preliminary injunction was entered by United States District Judge U.W. Clemon requiring the recognition of a transfer of the Deaton Alabama intrastate authority to Averitt pursuant to an order of the Interstate Commerce Commission. A copy

of that preliminary injunction is attached hereto as exhibit "A". At the time of the issuance of that preliminary injunction and pursuant to its order, a bond was filed by Averitt Express. A copy of that bond is attached hereto as exhibit "B".

3. Plaintiff Milan Express has contended since the ICC order was entered approving a transfer of the Deaton authority to Averitt in the spring of 1991 that this order of the ICC was unlawful and beyond the authority of the Interstate Commerce Commission. These contentions have been made in various appeals of the ICC order and of District Court actions related to the ICC order. The Eleventh Circuit United States Court of Appeals has entered a final order dated August 25, 1995 which is attached hereto as exhibit "C". Pursuant to this order, the Eleventh Circuit finally decided that the ICC's order was unlawful and sets it aside. Thus, Averitt Express, Inc. has operated intrastate within the state of Alabama transporting general commodities over a large portion of the state of Alabama since at least November 25, 1991 through December 31, 1994 without holding legal authority to do so.

4. Milan Express, Inc. hereby asserts and claims that it has been injured by such operations of Averitt Express in that it has been required to pay legal costs in the amount of $53,562.00 in order to have set aside the ICC orders purportedly approving such operations and, Milan further asserts that revenues which would have been generated by Milan from its Alabama intrastate and related interstate general commodity operations have been diverted from Milan to Averitt Express over this period in excess of three years operated by Averitt illegally.

5. As a result of the aforesaid matters, plaintiff Milan Express hereby claims the proceeds of that bond set out and attached hereto as exhibit "B" and such additional amount as may be assessed as damages against Averitt Express, Inc. arising out of the wrongful operations of Averitt Express, Inc. in the state of Alabama during the time period which it has so operated under the illegal authority of the orders of the Interstate Commerce Commission.

6. Plaintiff further asserts that this Court has authority and jurisdiction under the Interstate Commerce Act, 49 U.S.C. § 11708 and to award attorney's fees to the plaintiff incurred in order to establish its rights under this Act. Additionally, this Court has authority and jurisdiction to consider and award these damages as a result of the court's action in granting the injunctive orders which allowed such operations to be begun and continued.

WHEREFORE, Plaintiff hereby prays that the Court will enter a judgment pursuant to the bond, directly against Averitt Express, Inc. and for attorney's fees.

BISHOP, COLVIN, JOHNSON & KENT 317-20th Street, North P.O. Box 370404 Birmingham, Alabama 35237 (205) 251-2881

/s/ Gerald D. Colvin, Jr.

Gerald D. Colvin, Jr.

SERVE DEFENDANTS BY CERTIFIED MAIL:

AVERITT EXPRESS, INC. c/o Robert L. Baker, Esq. Suite 600 Nashville City Center 511 Union Street Nashville, TN 37219-1745

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

MILAN EXPRESS, INC., Plaintiff,

v.

AVERITT EXPRESS, INC., et al., Defendants.

CIVIL ACTION NO. CV 95-AR-2721-S.

Sept. 18, 1998.

SPECIAL JURY INTERROGATORIES

The jury will answer the following questions:

1. Did plaintiff, Milan Express, Inc. ("Milan"), prove by a preponderance of the evidence that it suffered damage as a proximate consequence of the injunction which was issued by this court and which was the subject of the $50,000 injunction bond executed by defendant, Averitt Express, Inc. ("Averitt"), as principal, and upon which defendant, United States Fidelity & Guaranty Company ("USF&G"), acted as surety?

YES ✓ NO _____

2. ONLY IF the jury has answered "Yes" to Question No. 1, what, if any, amount of damage not exceeding $50,000 has Milan proven by a preponderance of the evidence that it sustained as a proximate consequence of the erroneously issued said injunction?

$ 50,000

3. Did Milan prove by a preponderance of the evidence that Averitt operated trucks in Alabama under apparent but contested intrastate motor carrier authority in competition with Milan for some period of time, and that the said apparent intrastate authority, later determined by the Court of appeals for the Eleventh Circuit to have been erroneously granted by the Interstate Commerce Commission ("ICC"), was acquired by

Averitt from the ICC not in good faith?

YES ✓ NO _____

4. ONLY IF the jury has answered Question No. 3 "YES," what, if any, amount of damages has Milan proven by a preponderance of the evidence that it sustained as a proximate consequence of the operation by Averitt under apparent Alabama intrastate authority during the time between the issuance of the purported intrastate authority by the ICC to Averitt and the date upon which deregulation of intrastate truckers became effective? (SUBTRACTING ANY SUM THE JURY MAY HAVE AWARDED IN ANSWER TO QUESTION NO. 2.)

$ 1,870,521.21

/s/ Nathan L. Miller

JURY FOREMAN